# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00695-CV

---

### S. S., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 296447, THE HONORABLE ALAN MAYFIELD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

S.S. (Mother) appeals from the trial court's termination decree following a bench trial.[1]  The trial court found that Mother knowingly placed or knowingly allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct or knowingly placed her children with persons who engaged in conduct that endangered their physical or emotional well-being, and failed to comply with the provisions of a court order that established the actions necessary for her to obtain the return of her children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).  The trial court also found that termination of Mother's parental rights to her four children was in the best interest of the children.  *Id.* § 161.001(b)(2).  On appeal, Mother challenges the legal and factual sufficiency of the evidence

---

[1] To protect the children's privacy, we will refer to them by pseudonyms and will refer to family members by their relationships to the children.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  Although the fathers' parental rights were also terminated, they are not parties to this appeal.

supporting the trial court's best-interest determination and the finding that she failed to comply with the provisions of a court order. We will affirm the trial court's termination decree.

**BACKGROUND**

In September 2020, after receiving a complaint concerning Mother's parenting in this case, the Department of Family and Protective Services ("Department") filed a suit affecting the parent child-relationship between Mother and her three daughters E.B., A.M., and O.M. and her son T.B. Mother had been appointed managing conservator of E.B. and T.B. in December 2018, and the present suit sought to modify her status as managing conservator of those two children and alternatively terminate her parental rights regarding all of the children. The Department sought to be named as the children's temporary managing conservator and explained that it would seek termination of Mother's parental rights if reunification could not be achieved. In October 2020, the Department was appointed as the children's temporary managing conservator. During its investigation, the Department ultimately recommended that Mother's parental rights be terminated. At the conclusion of the termination hearing in December 2021, the children were the following ages: E.B. seven, T.B. six, A.M. three, and O.M. two. The trial court ultimately terminated Mother's parental rights to all four children.

Before beginning the investigation in this case, the Department had conducted four separate investigations of Mother's parenting. The first two investigations started in January 2015 and August 2017 in response to allegations regarding Mother's marijuana use and her mental health and allegations of domestic abuse in the home. Those investigations resulted in family-based services cases in which Mother completed the Department's services.

The third investigation also occurred in 2017 and resulted in the children being removed from Mother's care for approximately a year. The Department learned that Mother had resumed using marijuana and that Mother and the father of her two youngest children ("Father") had a physical altercation in which Father choked and threw her and in which she cut him with a knife in front of two of the children who witnessed the incident. The Department required Mother to submit to drug testing and therapy. Several months later, the Department returned the children to Mother's care after she completed her services.

In May 2019, approximately five months after the children had been returned to Mother's care, the Department again removed the children from Mother's custody after learning that she had again resumed using marijuana. Following removal, Mother was admitted to a mental-health hospital. The Department required Mother to attend individual therapy, participate in other mental-health treatment, and undergo drug testing. Approximately one year later, the Department returned the children to Mother's custody after she completed the recommended services.

Approximately two months after the second return, the Department received a complaint in this case alleging neglectful supervision by Mother. During a follow-up at Mother's home, an investigator observed that Mother appeared "overwhelmed" and that there were "bugs on the walls, the children appeared 'dirty,' and the home appeared cluttered." When talking with Mother and E.B., the investigator learned that Father recently fought with Mother, exhibited "domestic violence behaviors again," kicked down the door to her apartment, hit her, threw her around the apartment, pushed her outside, and locked her out of her home, causing neighbors to intervene. Regarding that incident, E.B. told the investigator that Father "choked" and "hurt" Mother during the incident and that Father often yelled at Mother.

3

When talking to the investigator, Mother at first denied using marijuana but then admitted to using after testing positive twice in the weeks following the start of the investigation. The Department removed the children from Mother's custody in September 2020. A few days after the removal, drug testing performed on the two younger children's hair was positive for marijuana. The three sisters were placed together with the same foster parents ("Foster Parents"). T.B. was transferred among several facilities due to disruptive behavior before he was placed in a special-needs facility for children.

As part of her family service plan, Mother was required to take protective-parenting classes, maintain safe housing, refrain from using marijuana, attend individual therapy, submit to random drug tests, submit to a drug and alcohol assessment, participate in supervised visits with her children, refrain from criminal activity, and submit to a psychological evaluation. Under the plan, diluted test results and failures to test were considered positive test results. During the investigation, Mother submitted to multiple urine and hair-follicle tests. Although many of the urine tests produced negative results, other tests produced the following results: two positive urine tests for marijuana in August 2020; positive hair follicle tests for marijuana in September 2020, December 2020, and March 2021; diluted sample results in December 2020, May 2021, and August 2021; three diluted sample results in September 2021; and failure to test in November 2020, February 2021, and June 2021.

As required by her family service plan, Mother regularly participated in individual therapy, and her therapist's recommendation was monitored return of all four children. Mother attended weekly visits with her three daughters and would bring activities for them to work on, and Mother visited with T.B. at the facility where he lived. Additionally, Mother submitted to an alcohol and drug assessment. Based on her self-reported behavior, the assessment indicated that

Mother did not have a substance-abuse disorder. Mother also obtained a certification for a drug-education class and participated in parenting classes. In May 2021, Mother moved with her new boyfriend ("Boyfriend") into an apartment with three bedrooms. Mother maintained full-time employment at a fast-food restaurant and became a manager at the restaurant.

After the children were removed from Mother's custody, the Department had E.B. evaluated by a counselor. In her report to the Department, the counselor explained that E.B. attends a weekly therapy session and diagnosed E.B. as suffering from trauma and a stressor-related disorder. Additionally, the counselor explained that E.B. needs additional therapy "to help process traumatic events from her past including exposure to domestic violence, multiple removals from her mother's care, and possible sexual abuse." Further, the counselor explained that E.B. "has endured a lot emotionally and psychologically" and "cannot heal from the trauma of her experiences if the pattern of removal continues" and recommended that E.B. remain with Foster Parents where she has found stability and structure. The counselor also documented in her notes from a session from March 2021 that E.B. cries at night because she misses Mother. Another evaluator from T.B.'s facility explained in a report for the Department that T.B. has autism, limited communication skills, an intellectual disability, a disruptive mood dysregulation disorder, and attention deficit hyperactivity disorder, and the evaluator also noted that T.B. has been the victim of child neglect. The evaluator recommended psychiatric treatment, considerable guidance and supervision for his safety and the safety of others, individual therapy, and pharmacological intervention.

The final permanency report by the Department documented that Mother became romantically involved with Boyfriend after the children were removed and that Mother and Boyfriend moved into a new apartment with three bedrooms; however, the report also expressed

5

concern that Mother is dependent financially on Boyfriend and might struggle to balance work and her family obligations now that she is working, particularly since T.B. has special needs and behavioral issues. The report also expressed concerns about how Mother did not obtain proper services for T.B. while he was in her custody and about how this may have contributed to his behavioral issues. The report explained that the three sisters have lived with Foster Parents since their removal in September 2020 and that Foster Parents have a strong bond with the three sisters and want to adopt them. The report described E.B. as happy, artistically inclined, and independent and described A.M. and O.M. as happy young girls who are well adjusted to their foster home. Regarding T.B., the report documented that he is doing well and flourishing in his current placement. Although the report reflected that Mother was participating in individual therapy regularly, that her visits with her children went well, and that her therapist recommended monitored return of the children, the report also recommended that her rights be terminated, that Foster Parents be allowed to adopt the three sisters, and that T.B. continue residing at his current placement.

The Court Appointed Special Advocate ("CASA") also prepared a report concerning the children's future placement. Regarding E.B., the CASA explained that her demeanor and behavior have improved after being placed on medicine while in Foster Parents' care and that E.B. would be traumatized if she were returned to Mother's custody, resulting in an interruption of her emotional healing. The CASA also discussed how E.B. has expressed her desire to live with Foster Parents and her sisters. Regarding T.B., the CASA related that his current placement has allowed him to improve his balance and coordination through occupational therapy. The CASA described all three sisters as being happy and adjusted in their placement with Foster Parents and stated that Foster Parents focus on the sisters' health and

6

safety. Regarding Mother, the CASA expressed concern about her ability to provide a safe environment for all four children and to remain drug free, stated that she would focus on only one child during her visits and would lose sight of the others, described her as being overwhelmed during a visit with the children, and related that she admitted to having difficulty monitoring the children. The CASA recommended that Mother's parental rights be terminated.

During the termination hearing, the trial court admitted into evidence the Department's final permanency report, the Department's removal affidavit, the CASA's report, Mother's family service plan, drug-test results for Mother and her two youngest children, and Mother's therapist's notes. In addition, the following witnesses testified: two Department caseworkers, the CASA, Mother's therapist, Mother, and Foster Father. The lawyer for Father also presented a statement regarding his wishes.

The first caseworker testified how Mother's children had been removed twice because of Mother's marijuana use and because of domestic violence and how the third and most recent removal occurred just a few months after the children were returned the second time. Regarding the last removal, the caseworker explained that the investigation started after the police were called regarding domestic violence between Mother and Father that E.B. witnessed. The caseworker related that the children were removed because Mother started using marijuana again and that the two youngest children tested positive for marijuana shortly after they were removed from Mother's care. Further, the caseworker related that Father had been arrested in the past for abusing Mother and violating a protective order.

The caseworker acknowledged that Mother was in therapy, that she is working, that she generally did not have difficulty complying with the requirements of her services plan, and that her visits with her children after their removal had been going well, but the caseworker

7

expressed concern that Mother could not care for all four children at the same time, particularly because Mother now has a full-time job for the first time. The caseworker acknowledged that Mother moved into a new apartment with Boyfriend, that the apartment is a safe and suitable home for the children, that the Department did not have any current concern about Mother's mental state, and that Mother has submitted to drug testing and participated in parenting and drug classes, but the caseworker expressed concern that Mother could not afford her apartment on her own and that Boyfriend has never met the children.

In her testimony, the caseworker acknowledged that Mother had not had a positive urine test since about the time that the children were removed and that the hair-follicle tests showed diminishing concentrations; however, she also stated that Mother has used marijuana in the past as a coping mechanism for her depression; that she had multiple positive hair-follicle test results after the children had been removed in this case, including one hair-follicle test performed seven months after the removal and after she became involved with Boyfriend; and that she had several diluted urine results. The caseworker stated that she was concerned that the children might be removed from Mother's custody again if Mother relapses. The caseworker acknowledged that Mother had not had any unsupervised visits with her children, in part, because the Department concluded that reunification was not its primary goal.

Regarding the children, the caseworker related that E.B. and T.B. both suffered from trauma. Further, the caseworker stated that E.B. is receiving the therapy that she needs, has expressed her preference to live with Foster Parents, and witnessed Mother and Father fight while living with them. Although the caseworker acknowledged that the other sisters are too young to express where they would like to live, the caseworker explained that all three sisters are bonded with Foster Parents. Regarding T.B., the caseworker related that he loves his current

8

placement, gets along with the other children there, is receiving the correct medications, is behaving better than ever, and has been participating in speech and occupational therapy. A second caseworker testified that the Department's goals for T.B. are to get his behavior stabilized before placing him in a foster home but also testified that Mother communicates well with T.B. and sings with him. The first caseworker testified that all four children are having their emotional and physical needs met at their respective placements. Further, the caseworker related that Foster Parents want to adopt the three sisters, that it is in the sisters' best interest to remain together, and that Foster Parents have promised that they will ensure the three sisters remain involved in T.B.'s life.

Finally, the caseworker testified that the Department recommended termination of Mother's parental rights because this is the third time that the children have been removed from her custody for an extended period of time, because the older two children have been feeling the effects of the trauma resulting from living with her, because she has exhibited a pattern of complying with the Department's requirements before resuming using marijuana and exposing the children to domestic violence, and because the children are all thriving in their current placements. Accordingly, the caseworker recommended that Foster Parents be allowed to adopt the three sisters and that the Department be named as permanent managing conservator for T.B.

The CASA testified about her observations of Mother and the children. Regarding Mother, the CASA acknowledged that she completed her services, submitted to drug testing, continued to reside in the new and appropriate apartment, and has not had a positive urine test since the children were removed; however, the CASA also testified that Father stated that Mother was not able to properly parent the children and that she continues to have difficulty monitoring multiple children at the same time during supervised visits, including one incident at

9

a park where E.B. had to tell Mother to retrieve the younger sisters after they had wandered an "uncomfortable" distance away. Although the CASA acknowledged that Mother would bring activities during her visits with the children, the CASA also related that she did not recognize that some of the activities presented choking hazards for the younger children.

Concerning E.B., the CASA related that she consistently expresses her desire to live with Foster Parents, that her therapist believes her psychological health could be impacted if she lived with Mother again, and that Mother would not be able to address E.B.'s mental-health issues. Regarding T.B., the CASA explained that his current placement has properly medicated him, is able to provide the constant supervision that he needs, has taught him to express himself through music, is working on getting him potty trained, can provide the types of therapies that he needs, and is working on his behavioral issues with the ultimate goal of enrolling him in public school. Moreover, the CASA related that when Mother had custody of T.B., she did not attempt to enroll T.B. in therapies that would have benefitted him. Concerning the younger sisters, the CASA related that they are both happy and well cared for by Foster Parents. Finally, the CASA testified that she initially recommended that Foster Parents be appointed managing conservators for the sisters but later concluded that termination of Mother's parental rights was in all the children's best interest because of how well the children have been doing at their current placements and because of their need for stability and permanence.

Mother's therapist testified that she counseled Mother from November 2020 to July 2021, that Mother was actively engaged in the therapy and requested an extension, that she followed through on recommendations, and that she was discharged from therapy in July 2021. Further, the therapist explained that Mother's urine tests produced negative results, that the hair-follicle tests produced results indicating that marijuana was leaving her system, that she obtained

10

and maintained employment, that she moved into a better place to live, that she continues to stabilize, and that she found other ways to deal with stress rather than using marijuana. The therapist also related that she did not see anything about Mother's mental health that indicated she would have difficulty being attentive to her children; however, the therapist acknowledged that she did not know where the children wanted to live, did not know how the children were doing, and made her monitored-return recommendation based only on her work with Mother. Additionally, Mother's therapist admitted that she was unaware that Mother had tested positive for marijuana in March 2021 and had multiple diluted test results and acknowledged that if the March result was from new use, that result would indicate that Mother has not resolved her drug issue.

Following her therapist's testimony, Mother testified that she has completed the counseling required by her services plan and continues to submit to drug testing, that her drug tests results have been negative, and that she enrolled in services not required by the Department, including drug-education classes, couples therapy, and more parenting classes. Additionally, Mother related that she has learned to use coping mechanisms other than marijuana, takes medicine for her mental health, and no longer feels the need to self-medicate. Mother denied using marijuana since this case started and described her apartment as having room for all the children. Moreover, Mother explained that she is now a manager at a fast-food restaurant and has the authority to adjust her work schedule to accommodate her children. Further, Mother stated that Boyfriend helps pay the bills and is ready to help raise the children.

In her testimony, Mother admitted that she has repeatedly claimed that she would provide a safe home for her children before their most recent removal, that her first involvement with the Department in 2015 should have resulted in her making significant life changes, that she

11

relapsed multiple times resulting in further Department investigations, that the initial positive tests in this case were accurate, and that E.B. suffers from trauma and anxiety caused by Mother's choices. However, Mother also stated that she believed there will be no more removals because she has changed so much about her life, including her support system, her home, and her job. Further, Mother testified that Father has been out of her life for a year and a half. Mother also related that she could provide a safe and stable environment for all her children, that T.B. would do well in her new home, that she can communicate with T.B. better than anyone, and that O.M. would be placed in daycare while she worked.

After Mother finished testifying, Foster Father explained that he and his wife are committed to providing for the sisters either as adoptive parents or as custodians and are committed to making sure that they have a relationship with T.B. Foster Father also communicated that the sisters are happy in their home. Regarding E.B., Foster Father testified that they have "a father/daughter bond," that she wants to be near him, that she calls him "Dad," and that he is concerned about the consequences to her if the children are removed from his and his wife's care. In addition, Foster Father promised to follow the Department's recommendations concerning the sisters and testified that it was in the sisters' best interest for Mother's rights to be terminated and for him and his wife to adopt them.

Finally, the lawyer for Father related his beliefs that all of the children are happy where they are and that the three sisters should remain in the care of Foster Parents.

Following the conclusion of the hearing in December 2021, the trial court issued its decree in January 2022, finding that termination of Mother's parental rights to her four children was in their best interest and that Mother knowingly placed or allowed the children to remain in conditions that endangered their physical and emotional well-being, engaged in

12

conduct or knowingly placed the children with individuals who engaged in conduct that endangered their physical and emotional well-being, and failed to comply with the provisions of a court order establishing the actions necessary for her to obtain the return of the children.

Mother appeals the trial court's decree terminating her rights to her children.

## STANDARD OF REVIEW AND GOVERNING LAW

To terminate an individual's parental rights, the Department must prove by clear and convincing evidence that the parent engaged in conduct listed as a statutory ground for termination in the Family Code and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. When reviewing a termination order, appellate courts defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630-31 (Tex. 2018). The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding

13

and ascertain "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## DISCUSSION

In her first issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's best-interest determination. In her second issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support the trial court's determination that she failed to comply with the provisions of a court order establishing the actions necessary for her to obtain the return of her children.

### Best Interest

The best-interest prong "is child centered and focuses on the child's well-being, safety, and development." *Id.* This determination is guided by multiple non-exclusive factors, including the following: (1) the child's wishes; (2) the child's physical and emotional needs; (3) the physical and emotional danger to the child now and in the future; (4) the parental abilities of the people seeking custody; (5) programs available to help those people; (6) the plans for the child by those people or the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions indicating that the parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The Department need not prove all the factors, and the absence of evidence for some of the factors does not preclude a finding that termination is in the

14

child's best interest. *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.). "While no one factor is controlling, the analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the child's best interest." *Id.* Evidence pertaining to a statutory ground for termination may also be probative of the best-interest prong. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

On appeal, Mother argues that the evidence was insufficient to support the trial court's best-interest determination for several reasons. First, Mother highlights the testimony describing her current home as safe and suitable for children and notes that she became employed full-time during the case and was promoted to a manager. Further, Mother points to testimony from the first caseworker explaining that the Department did not have concerns regarding Mother's current behavior and mental state. Next, Mother references the evidence establishing that she completed the requirements of her services plan and elected on her own volition to extend individual therapy and to enroll in and attend additional classes.

Mother also relies on testimony from her therapist stating that Mother was engaged in counseling and followed through with recommendations; that Mother has continued to stabilize, addressed her anxiety, identified her triggers leading to marijuana use, and developed healthy relationships; that she had no concerns about Mother's current mental state and her ability to be responsible for caring for her children; and that she recommended that the children be returned to Mother's care on a monitored basis. Additionally, Mother refers to her own testimony in which she explained that Father was a trigger for her marijuana use, that Father is out of her life, and that her current mental-health medication is working. Moreover, Mother asserts that the only two positive urine tests in this case occurred early on and that the CASA's report indicated that she had remained drug free since the children's removal.

15

Regarding domestic-violence concerns, Mother highlights that Boyfriend does not have a criminal history and that the first caseworker testified that she was not concerned that Mother was currently involved in an abusive relationship or still romantically involved with Father.

In addition, Mother summarizes testimony and other evidence discussing how her visits with her children went well, how E.B. cried because she missed Mother, and how Mother and T.B. were able to communicate even though he was mostly nonverbal. Further, Mother points to her own testimony expressing that she would make every effort to make a safe and stable home for her children, lives near where her children would go to school, would be able to drive her children to school, and could make a work schedule that would accommodate her children's needs.

However, evidence other than that relied on by Mother was presented during the hearing.[2] *See id.* When making her recommendation, Mother's therapist acknowledged that she did not know how the children were doing and was unaware that Mother tested positive for marijuana in March 2021 and had multiple diluted test results, and the therapist agreed that if the positive result was from new use, Mother has not resolved her drug issue. Further, evidence was presented regarding Mother's extensive history of substance abuse and regarding how her drug

___

[2] We note that the CASA and the first caseworker both testified that E.B. wanted to live with Foster Parents and her sisters. However, E.B. did not testify, and there was no evidence regarding whether she was sufficiently mature to make that determination. Moreover, the first caseworker testified that the other two sisters were too young to express a preference regarding where they would like to live. Additionally, the evidence pertaining to T.B. demonstrated that he has a limited ability to express himself. Accordingly, the children's desires do not weigh in favor of or against termination of Mother's rights. *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (holding desire-of-child factor as neutral where children did not testify at trial, where some of children were too young to express preference, and where there was no evidence showing sufficient maturity of older children aged nine, eight, six, and five years old being able to express living preference); *In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.— Houston [1st Dist.] 2012, no pet.) ("The young age of the [three-year-old] child render[s] consideration of the child's desires neutral.").

16

use led to the Department's intervention and the children's removal multiple times before the present case. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (noting that parental drug use is relevant to best-interest determination); *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (observing that evidence of "continued drug use . . . demonstrates an inability to provide a stable environment for [child] and an inability to provide for his emotional and physical needs").

Furthermore, evidence presented during the hearing established that Mother tested positive for illegal drugs after the children were removed from her care. *See D.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00255-CV, ___ S.W.3d ___, 2021 WL 5098308, at *5 (Tex. App.—Austin Nov. 3, 2021, no pet.) (noting that "this and numerous other courts of appeals have recognized that a parent's decision to use illegal drugs while the termination suit is pending, and the parent is at risk of losing her child, may support a finding of endangering conduct"); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (same); *see also In re M.A.J.*, 612 S.W.3d 398, 407-08 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (determining that evidence of positive drug tests after receiving referral that parent used narcotics was sufficient to support endangerment finding). And evidence demonstrated that the two youngest children also tested positive for marijuana at the time of the removal. *See In re A.T.-W.*, No. 07-19-00141-CV, 2019 WL 4125128, at *4 (Tex. App.—Amarillo Aug. 29, 2019, pet. denied) (mem. op.) (concluding that factor considering parental abilities weighed in favor of termination because mother "failed to demonstrate an ability to cease using cocaine or protect her children from the drug" where she and children tested positive for cocaine).

In addition, although Mother referenced evidence suggesting that she has made significant improvements in her life, "evidence of improved conduct, especially of short-

duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *see also In re M.G.D.*, 108 S.W.3d 508, 513, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (noting that "evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue," that narcotics-abuse and physical-abuse issues "sometimes reappear," and that factfinder is not required to ignore history of drug use and abuse "merely because it abates as trial approaches").

Although Mother notes that her two positive urine tests occurred at the beginning of this case and that the hair-follicle tests showed a reduction in marijuana concentration over time, Mother also had multiple diluted test results and failed to test three times during this case, including shortly before and shortly after the first day of the termination hearing. Under Mother's family service plan, those diluted results and failures to test counted as positive drug results. *See In re K.M.R.*, No. 14-17-00651-CV, 2018 WL 614762, at *12 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, pet. denied) (mem. op.) ("As sole arbiter of credibility and demeanor, the trial court was free to credit positive test results over Father's denial of cocaine use"); *see also In re S.S.*, No. 04-18-00325-CV, 2018 WL 6182852, at *6 (Tex. App.—San Antonio Nov. 28, 2018, no pet.) (mem. op.) (determining that evidence was sufficient to support best-interest determination where evidence showed, among other things, that mother tested positive for drugs on more than one occasion during pendency of case). Further, a hair-follicle test conducted more than seven months after the children were removed revealed that Mother still had marijuana in her system. *See M.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00531-CV, 2021 WL 1704258, at *8 (Tex. App.—Austin Apr. 30, 2021, no pet.) (mem. op.) (noting testimony that "hair-follicle test can trace the use of substances as far back as 90 days");

18

*In re J.C.R.*, No. 04-18-00949-CV, 2019 WL 2110109, at *3 (Tex. App.—San Antonio May 15, 2019, pet. denied) (mem. op.) (same).

Moreover, evidence was presented during the hearing showing that Mother was in an abusive relationship with Father for years and that the abuse resulted in intervention by the Department. *See In re S.K.A.*, 236 S.W.3d 875, 903 (Tex. App.—Texarkana 2007, pet. denied) (explaining that history of abusive or assaultive conduct in child's family is relevant to best-interest analysis). Additionally, the children were present and witnessed some of the acts of abuse. *See In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (noting that "history of domestic violence in front of the Children" supported determination that termination was in children's best interest). Although Mother completed services in prior Department cases, including two prior cases where her children were removed from her custody, she still engaged in the behavior that led to the current case, and the first caseworker expressed concern that the children will be removed again if returned to Mother's custody because she has a history of complying with the Department's requirements before relapsing. *Cf. In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (explaining that "trier of fact may measure a parent's future conduct by his past conduct" in best-interest determination). Moreover, Mother conceded that she should have altered her behavior after the first intervention by the Department.

In addition, the evidence showed that the four children were happy and thriving in their current placements and that the three sisters have a strong bond with Foster Parents. Further, E.B. and T.B. suffered trauma while living with Mother, and E.B. continues to need therapy to process her exposure to domestic violence and her repeated removals from Mother's care. E.B.'s counselor explained that E.B. will not heal from her trauma if the pattern of removal

19

continues.  In his current placement, T.B. is receiving services and medication that he has needed, and his behavior has improved.  Moreover, the first caseworker and the CASA both described concerns about Mother being able to monitor all of the children at the same time because of behavior that she exhibited during visits with the children and because of admissions made by Mother, and they both recommended that Mother's rights be terminated.  *Cf. In re C.A.J.*, 122 S.W.3d at 893 (noting that parent's inability to provide adequate care for children may be considered in best-interest determination).  The caseworker also explained that over the last forty months, Mother only had custody of the children without intervention by the Department for nine months.

Moreover, the caseworkers explained that the Department was recommending that the three sisters be adopted by Foster Parents, that T.B. remain in his current placement where he receives the services that he needs, and that T.B. attend public school and live in a foster home when he is ready.  In his testimony, Foster Father discussed how he and Foster Mother cooperated with the Department and CASA during this case, have bonded with the sisters, have provided the sisters with rooms that meet their needs, are committed to providing for the sisters' needs, will follow all the professionals' recommendations regarding the children's care, want to adopt the sisters, and intend to ensure that the sisters have a relationship with T.B.  *See Hann v. Texas Dep't of Protective & Regul. Servs.*, 969 S.W.2d 77, 83 (Tex. App.—El Paso 1998, pet. denied) (observing that "establishing a stable, permanent home for a child is a compelling interest for the government"), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 & n.39 (Tex. 2002); *see also In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *17 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (considering in best-interest analysis evidence of children doing well in placement with foster parents, who were meeting

20

children's needs, and noting that children had been placed together); *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ) (observing that best-interest determination may consider whether termination would allow adoption to occur), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d at 267 & n.39.

Viewing all the evidence in the light most favorable to the trial court's decree, we conclude that a fact finder could have formed a firm belief or conviction that termination of Mother's parental rights is in the best interest of her four children. After weighing the disputed evidence that is contrary to the best-interest finding against the evidence supporting the best-interest finding, we conclude that the disputed evidence is not so significant that a reasonable fact finder could not have resolved it in favor of the finding. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in the children's best interest.

For these reasons, we overrule Mother's first issue on appeal.

**Statutory Predicate Ground for Termination**

In her second issue on appeal, Mother specifically argues that the evidence is legally and factually insufficient to support the trial court's determination that she failed to comply with the provisions of a court order establishing the actions necessary for the children to be returned to her custody. *See* Tex. Fam. Code § 161.001(b)(1)(O). In its appellee's brief, the Department notes, as set out above, that the trial court determined that other statutory grounds for termination also applied in this case. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment

of termination when there is also a finding that termination is in the child's best interest."). Therefore, the Department argues that because Mother does not challenge the trial court's findings under subsections (D) and (E) and because either of those grounds alone could support the trial court's termination decree, we need not address the legal and factual sufficiency of evidence pertaining to the challenged or unchallenged grounds. *See In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at \*11 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.). In her reply brief, Mother agrees that elements (D) and (E) "were not specifically listed issues within the brief" but urges that she did "not concede these issues" because "all factors needed to contest these findings are within the brief."

Even if Mother's briefing can be construed as also challenging the sufficiency of the evidence pertaining to the trial court's findings under (D) and (E), *see Plasma Fab, LLC v. BankDirect Cap. Fin., LLC*, 468 S.W.3d 121, 134 n.7 (Tex. App.—Austin 2015) (explaining that "an issue raised for the first time in a reply brief is waived and need not be considered by an appellate court"), *aff'd* 519 S.W.3d 76 (Tex. 2017), in resolving this issue, we would only need to consider whether the evidence is sufficient to support termination under either subsection (D) or (E), *see A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 698-99 & n.2 (Tex. App.—Austin 2019, pet. denied) (noting that when appellant challenges both subsection (D) and (E) findings, appellate court needs to ensure that evidence is sufficient to support one of those grounds); *see also In re N.G.*, 577 S.W.3d 230, 234, 237 (Tex. 2019) (explaining that "due process and due course of law" require appellate courts to review sufficiency of evidence supporting (D) or (E) grounds "when the parent has presented the issue to the court" because endangerment findings in prior termination proceedings can be used as basis for termination in subsequent proceedings involving other children). Under subsection (E), a trial court may

terminate an individual's parental rights if the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "In this context, 'endanger,' means 'to expose to loss or injury, to jeopardize.'" *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "Endangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,' but it is not necessary that the conduct was directed at the child or that the child actually suffered injury." *Id.* (quoting *In re M.C.*, 917 S.W.2d at 269).

Under subsection (E), the relevant inquiry is whether evidence exists that the parent's conduct, including acts, failures to act, and omissions, endangered the child's well-being. *In re D.O.*, 338 S.W.3d 29, 34 (Tex. App.—Eastland 2011, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Termination under this subsection must be based on more than a single act or omission; rather, a deliberate, voluntary, and conscious course of conduct is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). However, the conduct at issue does not need to be aimed at the child, and the child does not need to suffer an injury. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

A parent's drug use can constitute evidence of endangerment, *D.H.*, 2021 WL 5098308, at *3; *In re T.N.*, 180 S.W.3d at 383, and evidence that a child has been exposed to drugs can also constitute evidence of endangerment, *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *5 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.). A reasonable

23

inference that a parent was avoiding testing because the parent was using drugs can be made from a parent's failure to attend scheduled drug screenings. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). Similarly, evidence establishing domestic violence in the home may constitute evidence of endangerment under subsection (E) even if the violence is not directed toward the child. *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied).

As discussed previously, the Department removed the children in this case because of domestic violence occurring in the home and because of Mother's drug use. Moreover, the children witnessed domestic violence occurring between Mother and Father, and E.B. was traumatized by the abuse and continues to need therapy to process the events and heal. *See In re P.W.*, 579 S.W.3d at 727. Further, at the time of the removal, the two youngest siblings tested positive for marijuana. *See In re E.R.*, No. 07-20-00276-CV, 2021 WL 359781, at *5 (Tex. App.—Amarillo Feb. 2, 2021, no pet.) (mem. op.) (concluding that evidence showing that "children tested positive for crack cocaine" established conduct "that endangered their physical well-being"). In addition, the children were removed from Mother's custody by the Department multiple times before this case. Although Mother completed her services to obtain the return of the children in the prior removals, she subsequently reengaged in the endangering conduct that resulted in their removal in this case. *Cf. In re D.O.*, 338 S.W.3d at 34 (noting in endangerment analysis "that the Department has conducted numerous investigations" of parents "over the years").

Further, although Mother asserts that the evidence is insufficient to support a determination that she used marijuana after the children's removal, Mother missed several urine

24

tests and had multiple diluted results, supporting a reasonable inference that she had used drugs around those testing times. *See In re W.E.C.*, 110 S.W.3d at 239. Additionally, Mother had positive hair-follicle tests throughout this case, including one taken more than seven months after the children were removed. *Cf. D.H.*, 2021 WL 5098308, at *3 (noting that "a parent's drug use may support termination under subsection (E) because it exposes the child to the possibility that the parent may be impaired or imprisoned").

Viewing all the evidence in the light most favorable to the trial court's decree, we believe that a fact finder could have formed a firm belief or conviction that Mother engaged in conduct endangering the children's physical or emotional well-being. In light of the entire record, we believe that the disputed evidence that a reasonable fact finder could not have credited in favor of the endangerment finding is not so significant that a fact finder could not reasonably have formed a firm belief or conviction that Mother engaged in conduct endangering the children's physical or emotional well-being. Accordingly, after considering the relevant factors under the appropriate standards of review, we would conclude that the evidence is legally and factually sufficient to support the trial court's endangerment determination.

For these reasons, we overrule Mother's second issue on appeal.

## CONCLUSION

Having overruled both of Mother's issues on appeal, we affirm the trial court's termination decree.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   July 8, 2022